PEOPLE v DRAKE

1. APPEAL AND ERROR—CRIMINAL LAW—TRANSCRIPT—SETTLED RECORD—FAILURE TO FILE—COURT RULES.

Failure of the state to file a transcript or settled record with the Court of Appeals will not automatically require a new trial where the state, after a good faith effort, cannot physically provide a transcript (GCR 1963, 812.2[b]).

2. APPEAL AND ERROR—TRANSCRIPT—UNAVAILABILITY OF TRANSCRIPT —NEW TRIAL.

A new trial will be required where in an appeal as of right the trial transcript is not available and where the appellant makes a showing that the unavailability of the transcript caused prejudice sufficient to deprive him of a fair appeal.

3. APPEAL AND ERROR—CRIMINAL LAW—EVIDENCE—PROSECUTORS— EXHIBITS—FAILURE TO FILE—RIGHT OF APPEAL.

Failure by the prosecution to file with the Court of Appeals all the required exhibits mandates a new trial only where the defendant is so prejudiced thereby that his constitutional right of appeal has been impeded.

4. CRIMINAL LAW—EVIDENCE—NONPRODUCTION BY PROSECUTION—MATERIALITY—CONSTITUTIONAL LAW—DUE PROCESS.

A failure by the prosecution to produce available evidence favorable to an accused after a request for the production of such evidence violates due process where the evidence is material either to guilt or to punishment irrespective of the good faith or bad faith of the prosecution; evidence is material if the

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 4 Am Jur 2d, Appeal and Error § 86.

[3] 4 Am Jur 2d, Appeal and Error §§ 61, 123, 124.

[4] 21 Am Jur 2d, Criminal Law §§ 222, 224–226.

[5] 40 Am Jur 2d, Homicide § 433.

[6, 7] 58 Am Jur 2d, New Trial §§ 204–207.

[8] 40 Am Jur 2d, Homicide §§ 519–521.

Duty of trial court to instruct on self-defense, in absence of request by accused. 56 ALR2d 1170.

[9] 75 Am Jur 2d, Trial §§ 915, 916.

evidence could in any reasonable likelihood have affected the judgment of the jury.

5. HOMICIDE—MANSLAUGHTER—CRIMINAL LAW—EVIDENCE—NONPRO-
   DUCTION BY PROSECUTION—CAUSE OF DEATH.

   Suppression by the prosecution in a trial for manslaughter of disputed evidence, the results of an analysis of the decedent's blood and urine which was conducted during the autopsy, after a request by the defense and an order by the court for its production, where the disputed evidence is material inasmuch as it relates directly to the disputed cause of the decedent's death, is reversible error if the test results would have been favorable to the defendant's case.

6. APPEAL AND ERROR—NEW TRIAL—EVIDENCE—NONPRODUCTION BY
   PROSECUTION—EVIDENTIARY HEARING.

   The Court of Appeals in appropriate circumstances to avoid a possibly useless new trial but also to avoid a possible miscarriage of justice remands to the trial court for an evidentiary hearing to determine the harm resulting from the prosecution's failure to produce in a trial for manslaughter physical evidence relating to the cause of the decedent's death; the prosecution shall produce the evidence at the hearing; if the evidence is not available, testimony shall be taken to determine what findings were made concerning the cause of death.

7. APPEAL AND ERROR—NEW TRIAL—EVIDENCE—NONPRODUCTION BY
   PROSECUTION—EVIDENTIARY HEARING—HOMICIDE—MANSLAUGH-
   TER—CAUSE OF DEATH.

   A trial court, sitting in an evidentiary hearing upon remand regarding results of tests performed upon a decedent which the prosecution failed to produce in a trial for manslaughter, will hold a new trial if the tests indicate that the decedent died from a respiratory failure rather than from a blow to his head as charged by the prosecution; if the tests were not made or if the results negated respiratory failure, the prosecution's failure to produce the results was harmless error; and if the trial court cannot, to its satisfaction, discover the extent and results of the tests, a new trial shall be ordered because the error was not harmless beyond a reasonable doubt.

8. HOMICIDE—MANSLAUGHTER—INSTRUCTIONS TO JURY—SELF-DE-
   FENSE.

   A trial court did not commit reversible error in a trial for manslaughter by failing to *sua sponte* give the jury a self-defense instruction where there was sufficient evidence of a

withdrawal of the defendant's self-defense claim on the record, and defense counsel did not refer to self-defense during his closing argument.

9. CRIMINAL LAW—INSTRUCTIONS TO JURY—APPEAL AND ERROR—FAILURE TO OBJECT.

The Court of Appeals may not find error in instructions to the jury where the defendant did not object to the instructions at trial, in the absence of manifest injustice.

Appeal from Saginaw, Fred J. Borchard, J. Submitted May 12, 1975, at Lansing. (Docket No. 18676.) Decided October 13, 1975.

Richard Drake was convicted of manslaughter. Defendant appeals. Remanded for further proceedings.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *E. Brady Denton,* Prosecuting Attorney, and *Michael J. McNamee,* Assistant Prosecuting Attorney, for the people.

*Stiles, Fowler & Dudley, P. C.,* for defendant.

Before: QUINN, P. J., and BRONSON and N. J. KAUFMAN, JJ.

N. J. KAUFMAN, J. On June 8, 1973, defendant was convicted by a Saginaw County Circuit Court jury of manslaughter, MCLA 750.321; MSA 28.553. He was subsequently sentenced to a term of from 7 to 15 years and now appeals of right.

Defendant's conviction arose from the death of William Schindehette. Schindehette died in the early morning hours of November 5, 1972, following emergency brain surgery which was performed several hours after he had engaged in a fight with defendant at the Golden Glow Ballroom in Saginaw County. The conflict began at about 9:30 p.m.

when defendant saw the decedent at the ballroom and accused him of having, several months earlier, stolen money from defendant's friends. The argument over this accusation led to some pushing and wrestling, but the two were quickly separated by onlookers. However, shortly after this fight defendant and Schindehette again engaged in a fracas during which they exchanged punches and were again separated by bystanders.

Shortly thereafter, defendant and the victim again confronted each other. At trial, a number of eyewitnesses described this last fight. Several testified that defendant had hit Schindehette with a bottle. Two others claimed that Schindehette hit defendant with a chair, one indicating that this act was in retaliation to defendant's attack.

Defendant took the stand and testified that he "went at" Schindehette after he had picked up a chair. Defendant stated that the victim had hit him in the face with the chair but that defendant couldn't remember having hit the victim with a bottle. He claimed that his recollection of the fight was hazy.

A little while after the fight, Schindehette went home with his fiancée. He complained of head pains, and she drove him to a Saginaw hospital for treatment at about 11:45 p.m. Upon admittance, decedent's fiancée stated that decedent had fallen on wet leaves and had hit his head on a car. At trial, she claimed that this statement was a fabrication.

Several witnesses were called to describe the course of decedent's treatment. Dr. William Jackson testified that he treated decedent in the hospital's emergency room and recalled that, at the time, the victim had told him that he was then

undergoing methadone treatment for drug addiction. Dr. Jackson maintained that it was his opinion, based upon his observation of the victim at the time of this treatment, that Schindehette was not suffering from an overdose of a narcotic drug. When Schindehette's condition appeared to worsen noticeably, Dr. Jackson called for the assistance of a neurosurgeon, Dr. E. Malcolm Field.

Dr. Field testified that he had been called to the hospital early on the morning of November 5, 1972 and shortly thereafter performed an emergency operation in which he opened decedent's skull in an attempt to alleviate decedent's vomiting and respiratory failure. This operation revealed a blood clot on the brain and also disclosed a suture line separation which Dr. Field attributed to a recent external force. Although the witness removed the blood clot from Schindehette's brain, the victim died shortly thereafter. Dr. Field speculated as to a sequence of events leading to Schindehette's death: a blow to the head, a fracture and probable contusion of the brain triggering a seizure, resulting in cerebral edema (swelling), causing his death. He agreed that a person's use of narcotic drugs could depress the brain stem which controls respiration and would make that individual much more susceptible to respiratory arrest. On cross-examination he stated that it was the swelling of the victim's brain, not the clot, which killed him because the clot itself was not large enough to cause his death.

Dr. Field also related that he requested the pathologist to obtain a sample of decedent's blood or urine. The doctor also agreed that methadone or heroin in sufficient dosage could decrease or end a person's respiration. On redirect-examination, the witness averred that, in his opinion, it was

probably the blow to decedent's head which trig-
gered the chain of events resulting in his demise.

Concluding the medical portion of plaintiff's tes-
timony was Dr. Ulrich Mosher, the pathologist
who performed the autopsy on Mr. Schindehette.
According to Dr. Mosher, his postmortem examina-
tion revealed a hemorrhage of decedent's brain
and acute edema, but disclosed no skull fracture.
It was Dr. Mosher's opinion that the injury to the
victim's head caused the blood clot in his brain,
and he further opined that death was caused by
acute cerebral edema. His examination also re-
vealed a contrecoup injury to the brain which
could have been caused by a blow to the head.
Such an injury occurs when a blow to one side of
the head causes the brain to strike the side of the
skull directly opposite from the original point of
external impact. The injury to the left side of
decedent's brain could have been caused by an
injury to the head or by the surgery which dece-
dent had undergone prior to his death.

Dr. Mosher stated that, in his opinion, the vic-
tim's possible use of methadone and any possible
recent use of heroin—short of an overdose—would
not influence his diagnosis of the cause of dece-
dent's death. On cross-examination, Dr. Mosher
stated that he had removed blood and urine sam-
ples from decedent's body but did not know where
they were at the time of trial and did not know
where any results were from tests which might
have been run on the samples. Dr. Mosher stated
that the autopsy had disclosed three needle marks
on decedent's arm. These marks, he opined, were
made two or three hours prior to the autopsy,
while decedent was in the hospital.

At trial, defendant contended that the blow to
Schindehette's head did not cause his death. De-

fendant argued that death was precipitated by some combination of heroin and alcohol. To this end, defendant introduced Darryl Morgan, who was, at the time, in the same prison as defendant. Morgan stated that he had been at Schindehette's apartment at about 3:15 p.m. on November 4, 1972, the afternoon prior to death, and had seen Schindehette and his fiancée inject themselves with heroin. Decedent's fiancée had testified that, while both she and decedent had used heroin, both had stopped doing so and had not injected themselves for some time prior to November 4, 1972 or on that date.

I

Defendant's first claim is that plaintiff's inability to produce several trial exhibits on appeal deprives defendant of his right to appeal and constitutes reversible error. Defendant cites GCR 1963, 812.4 which provides:

"Exhibits. Within 20 days after filing of claim of appeal, attorneys for appellant or appellee having possession of any exhibits offered in evidence shall file them with the clerk for transmission to the Court of Appeals, as part of the record on appeal, unless by stipulation of counsel, or order of the trial court, it is provided that they shall not be transmitted, or that copies or summaries or excerpts shall be transmitted in lieu thereof, and provided further, that photostatic copies may be filed in lieu of originals of any exhibits, unless the trial court shall otherwise require. Upon final disposition of the case, such exhibits shall be returned to the persons who filed them."

Defendant bases his claim on the loss by the Saginaw police of six exhibits:

"1. Floor plan of Golden Glow Ballroom, showing the bar room and also the main ballroom.

"2. A Certificate of Death of William Schindehette.

"3. A diagram with four (4) drawings on it; one front, one back and from both sides of the face and skull.

"4. Same as three (3) above.

"5. Exhibit with the signature of Dr. Robert Feeheley, [who treated defendant for facial injuries], content of the exhibit unknown.

"6. Schematic diagrams showing scalp, skull and brain in the frontal section revealing the external-internal table that constitutes the oassis skull and the meninges and the arachnoid as the two parts that constitute the leptomeninges."

Plaintiff does not dispute the fact that these exhibits cannot be produced. Defendant does not make any averment of bad faith or negligence on the part of plaintiff. Manifestly, plaintiff's failure to produce the six exhibits is violative of Rule 812.4. However, we find no controlling precedent as to whether such a violation requires a new trial. We find most persuasive those cases where the trial transcript has been lost and no settled record can be made pursuant to GCR 1963, 812.2(b). This Court has held that the failure to file a transcript or settled record will not automatically require a new trial. In *People v Carson,* 19 Mich App 1; 172 NW2d 211 (1969), *lv den* 383 Mich 780 (1970), defendant attacked the validity of his 1934 guilty plea for which no transcript was available. Although a new trial was ordered, the Court stressed that a new trial would not always be the correct remedy:

"We do not mean to be understood as saying that the unavailability of the transcript of the proceedings at which an accused person was convicted necessarily affects the validity of his conviction. The failure of the

state to provide a transcript when, after good faith effort, it cannot physically do so, does not automatically entitle a defendant to a new trial. *Norvell v Illinois,* 373 US 420; 83 S Ct 1366; 10 L Ed 2d 456 (1963), *reh den* 375 US 870; 84 S Ct 27; 11 L Ed 2d 99 [1963], *United States, ex rel Smart v Pate,* 318 F2d 559, 562 (CA 7, 1963), contrast *United States v Randolph,* 259 F2d 215 (CA 7, 1958)." *Id.* at 7.

In *People v Drew,* 26 Mich App 337; 182 NW2d 566 (1970), where defendant attacked his 1958 conviction by alleging that the trial court erroneously found that defendant's confession was voluntary, this Court applied the same rule. Defendants in both *Carson* and *Drew* appealed by leave, because their convictions had occurred prior to the time when convictions in criminal cases were appealable by right. Const 1963, art 1, § 20. The Court in *Drew,* however, propounded a "test" for such claims raised in appeals by right:

"Upon direct appeal the unavailability of a transcript of the trial *might so impede enjoyment of a defendant's Michigan constitutional right of appeal* that a new trial might have to be ordered as a matter of course." (Emphasis supplied.) (Footnote omitted.) 26 Mich App at 341.

See also *People v Dunn,* 50 Mich App 529; 213 NW2d 832 (1973). In *Brown v Forrester Construction Co,* 372 Mich 204, 214; 125 NW2d 315 (1963), the Supreme Court required an appellant to show that a delay in transcription caused prejudice sufficient to deprive him of a fair appeal.

We find these opinions equally applicable here. Has plaintiff's failure to file all the required exhibits so prejudiced defendant that the enjoyment of his constitutional right of appeal has been impeded? We think not. Defendant has cited to us no

prejudice which will result from the unavailability of the six cited exhibits. All the exhibits were used by expert witnesses for demonstrative purposes, to clarify their trial testimony. The testimony related to the cause of decedent's death. This testimony is so complete and concise on the record that the exhibits are not necessary to the preparation of defendant's appeal or to our determination of that appeal.

More serious, however, is an error which defendant has raised only tangentially on appeal. Prior to trial, defendant obtained a trial court order requiring plaintiff to produce the results of an analysis of decedent's blood and urine which was conducted during the autopsy. In response to questioning by defendant, Dr. Mosher, the examining physician, stated that the test results were not available at trial. Plaintiff gave no reason for the nonproduction of the results. Dr. Mosher did not testify as to the extent or result of the analysis. Defense counsel neither moved to enforce the trial court's order nor requested a mistrial, but did, during closing argument, comment on plaintiff's failure to obey the order. We find the nonproduction of these test results presents potentially reversible error.

In *Brady v Maryland,* 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963), the United States Supreme Court held that:

"the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment *irrespective of the good faith or bad faith of the prosecution". Id* at 87. (Emphasis supplied.)

Under the *Brady* line of decisions, the important factors to be considered on appeal are:

"(a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence".

*Moore v Illinois,* 408 US 786, 794–795; 92 S Ct 2562; 33 L Ed 2d 706 (1972), *reh den* 409 US 897; 93 S Ct 87; 34 L Ed 2d 155 (1972). Evidence is material if the evidence "could * * * in any reasonable likelihood have affected the judgment of the jury". *Napue v Illinois,* 360 US 264, 271; 79 S Ct 1173; 3 L Ed 2d 1217 (1959). See also *Giglio v United States,* 405 US 150, 154; 92 S Ct 763; 31 L Ed 2d 104 (1972), *People v Dorsey,* 45 Mich App 230, 235–236; 206 NW2d 459 (1973), *lv den* 390 Mich 763 (1973).[1]

Given the fact that plaintiff's intent is irrelevant to our determination, it is clear that, under the *Brady-Moore* test, plaintiff has suppressed the disputed evidence after a request by defendant and an order by the court for its production. The disputed evidence is material to the contested issues inasmuch as it relates directly to the conflict between the parties' theories concerning the cause of decedent's death. The question, therefore, becomes whether the test results would have been favorable to defendant's case. If the blood and/or urine test demonstrated the presence of morphine and alcohol, they would significantly bolster defendant's theory that Schindehette died from a

---

[1] In *People v Dorsey,* 45 Mich App 230, 235–236; 206 NW2d 459 (1973), *lv den* 390 Mich 763 (1973), this Court adopted the test promulgated by the Second Circuit Court of Appeals in *United States v Keogh,* 391 F2d 138 (CA 2, 1968). Part of that test, while not directly in point, also relies heavily on the materiality of the suppressed evidence:

"2. Suppression of evidence where the evidence is requested by the accused and this request is denied by the prosecuting attorney and the court. This is a violation of due process if the evidence requested is *material* to the accused's guilt or punishment irrespective of the good or bad faith of the prosecuting attorney." (Emphasis supplied.)

respiratory failure induced by a combination of alcohol and heroin, rather than from the blow to his head.[2]

Of course, we do not know the extent or results of these tests. Nor do we know why defense counsel did not move to enforce the order. He may have made a tactical decision to go to trial and argue the nonproduction to the jury. The record gives us no answer. As such, we find the only correct remedy to be a remand to the trial court for an evidentiary hearing. The Michigan Supreme Court in *People v Robinson,* 390 Mich 629; 213 NW2d 106 (1973), *aff'd,* 391 Mich 555; 218 NW2d 1 (1974), established a similar remedy to determine the harm resulting from nonproduction of a res gestae witness. This remedy is as applicable to nonproduction of physical evidence as it is to nonproduction of testimonial evidence. Plaintiff shall produce the test results at the hearing. If the results are not available, testimony shall be taken to determine what findings were made. If the tests did, in fact, indicate the presence of morphine, a new trial must be required. If decedent's blood and urine were not tested for presence of morphine or if the test results negated its presence, the failure to produce the results would be harmless error and defendant's conviction shall be affirmed.

Finally, if the trial court cannot, to its satisfaction, discover the extent and results of the blood/ urine tests, a new trial shall be ordered because, in such a case, we could not find the error to have

[2] Morphine is the end-product resulting from the body's injestion of heroin. It is important to note that it was defendant's contention that the blow to Schindehette's head played no causal role in his death. If defendant had contended that the blow merely aggravated a pre-existing condition, defendant would still be responsible for Schindehette's death since a defendant takes his victim as he finds him. *People v Flenon,* 42 Mich App 457; 202 NW2d 471 (1972), *lv den* 388 Mich 801 (1972).

been harmless beyond a reasonable doubt. *People v Swan,* 56 Mich App 22; 223 NW2d 346 (1974).

## II

Defendant's second claim of error is that the court erred reversibly by failing to *sua sponte* give the jury a self-defense instruction. Plaintiff responds by claiming that defendant, in chambers, withdrew such a defense. We agree. Defense counsel objected to an attempt by the prosecutor to refute the self-defense theory during closing argument:

*[Mr. Kaczmarek, the prosecutor]:* "Now, the defense in his opening statement claims self-defense. However, Mr. Drake has stated from the stand that he never struck Mr. Schindehette's head. However, I would review briefly what the elements of self-defense are.

"First, that the person that uses self-defense is not the aggressor, and, second, that the use of force was—

*"Mr. Sturtz [Defense counsel]:* Your Honor, I hate to object to counsel's argument. I believe this matter was discussed in chambers.

*"Mr. Kaczmarek:* He used it in his opening statement. How can I—

*"The Court:* Are you withdrawing the element of self-defense?

*"Mr. Kaczmarek:* Is it on the record?

*"The Court:* Yes.

*"Mr. Kaczmarek:* Thank you."

We find sufficient evidence of a withdrawal of the self-defense claim from this colloquy, in addition to the fact that defense counsel did not refer to self-defense during his closing argument nor did he request a self-defense instruction.

### III

We find without merit defendant's third and final claim of error, that the trial court's instructions were prejudicial to defendant and inappropriate to his theory of the case. Defendant did not object to the instructions and we may not find error in the absence of manifest injustice. GCR 1963, 516.2. *People v McClure,* 29 Mich App 361; 185 NW2d 426 (1971), *lv den* 385 Mich 761 (1971). Having reviewed the challenged portion of the instructions in light of their entire context, *People v Tooks,* 55 Mich App 537; 223 NW2d 63 (1974), we find no such injustice.

Remanded for proceedings consistent with this opinion. We do not retain jurisdiction.