PEOPLE v AMISON

1. Evidence—Admissibility of Evidence—Court's Discretion.

   The admissibility of evidence at a trial is a matter consigned to the discretion of the trial court.

2. Criminal Law—Evidence—Alias—Court Orders—Witnesses.

   Admission of testimony by a police officer which stated that the defendant was introduced to the officer by the defendant's alias "Dirty Red" is not in violation of a pretrial court order prohibiting the use of the defendant's alias, where the order was meant to prohibit the inclusion of the alias only in the court files and not to restrict the testimony of witnesses.

3. Criminal Law—Evidence—Invited Error.

   The admission of testimony elicited from a prosecution witness in response to defense questioning which described the defendant as "a major drug supplier" is not reversibly erroneous where the defense counsel should have anticipated this very response from his own questions; the court will refuse to consider such invited error.

4. Criminal Law—Searches and Seizures—Participant Monitoring Procedures—Evidence.

   It is not error to allow investigating officers to relate remarks made by the defendant to an undercover officer and monitored by the investigating officers without a warrant, where such monitoring occurred prior to a Supreme Court decision which

References for Points in Headnotes

[1] 29 Am Jur 2d, Evidence §§ 249, 251–257, 267.

[2] 29 Am Jur 2d, Evidence § 623.
   75 Am Jur 2d, Trial § 793.

[3] 81 Am Jur 2d, Witnesses §§ 515–517.

[4] 68 Am Jur 2d, Searches and Seizures §§ 35–59.

[5, 8] 29 Am Jur 2d, Evidence §§ 451, 453–455, 472.

[6, 7, 10] 4 Am Jur 2d, Appeal and Error § 268.

[9] 29 Am Jur 2d, Evidence §§ 276, 278, 292.

[11] 29 Am Jur 2d, Evidence §§ 276–278, 292, 293.

[12] 29 Am Jur 2d, Evidence § 178.

holds that a search warrant is required prior to instituting a participant monitoring procedure and which decision is not retroactively applicable.

5. CRIMINAL LAW—EVIDENCE—SUPPRESSION—INTENT.

A loss of evidence is deemed a suppression regardless of the intent where the evidence is lost through actions of the police or the prosecutor.

6. CRIMINAL LAW—EVIDENCE—SUPPRESSION—APPEAL AND ERROR— FACTORS.

Important factors to be considered on appeal when evidence suppression is claimed by a defendant are: (1) suppression by the prosecution after a request by the defense, (2) the evidence's favorable character for the defense, and (3) the materiality of the evidence.

7. CRIMINAL LAW—EVIDENCE—SUPPRESSION—FACTORS—APPEAL AND ERROR.

In determining whether suppression of evidence requires the vitiation of a defendant's conviction, courts have examined and weighed factors such as the degree of negligence or bad faith involved, the importance of the evidence lost, and the evidence of guilt adduced at trial; courts have also concentrated on the importance of the evidence and the quality of police and prosecutorial conduct.

8. CRIMINAL LAW—EVIDENCE—LOST EVIDENCE—BAD FAITH—SUP- PRESSION.

A loss of evidence which occurs before a defense request for the evidence does not mandate reversal of a conviction, where there is no showing of bad faith or intentional suppressions.

9. CRIMINAL LAW—TAPE RECORDINGS—DESTRUCTION OF EVIDENCE— INTENTIONAL DESTRUCTION—APPEAL AND ERROR.

The intentional destruction of tape recordings, where the purpose is not to destroy evidence for a forthcoming trial, does not mandate reversal of a conviction in which the tapes may have been used as evidence.

10. CRIMINAL LAW—EVIDENCE—SUPPRESSION—APPEAL AND ERROR— PRESERVATION OF EVIDENCE.

Evidence suppression mandating reversal has been found only where there was no initial effort made to preserve the evidence or where there is a possibility that certain test results may have been actually suppressed.

11. Criminal Law—Lost Evidence—Suppression—Gross Negli-
      gence—Constitutional Law.

    There is no denial of due process by the loss of a tape recording
    of a drug sale transaction, where the evidence shows careless-
    ness on the part of the police but not intentional suppression of
    evidence or gross negligence in its loss (US Const, Am V; Const
    1963, art 1, § 17).

12. Criminal Law—Evidence—Constitutional Law—Witnesses—
      Confrontation—Nonproduction of Evidence—Expert Testi-
      mony—Suppression.

    A good faith, unintentional nonproduction of a tape recording of
    a drug sale does not require suppression of expert testimony
    concerning the evidence not produced in order to preserve a
    defendant's right to confront adverse witnesses, since the ex-
    pert witnesses are available for examination by the defense
    counsel (US Const, Am VI; Const 1963, art 1, § 20).

Appeal from Washtenaw, Edward D. Deake, J. Submitted May 6, 1976, at Lansing. (Docket No. 22001.) Decided July 19, 1976.

James Amison was convicted of delivery of a controlled substance, heroin. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William F. Delhey,* Prosecuting Attorney, and *Lynwood E. Noah,* Senior Assistant Prosecuting Attorney, for the people.

*Terence R. Flanagan,* Assistant State Appellate Defender, for defendant.

Before: J. H. Gillis, P. J., and M. F. Cavanagh and McGregor,* JJ.

McGregor, J. Defendant was convicted by a

---

* Former Court of Appeals judge, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

Washtenaw County Circuit Court jury of delivery of a controlled substance, heroin, MCLA 335.341(1)(a); MSA 18.1070(41)(1)(a). He was subsequently sentenced to a term of from 7 1/2 to 20 years in prison and now appeals of right.

On appeal, defendant propounds three claims of error. Defendant first contends that remarks made by the prosecutor, some over defense objection, so prejudiced defendant as to deny him a fair trial. His primary objection focuses on the prosecutor's introduction to the jury of defendant's alias, "Dirty Red". Prior to trial, defense counsel requested an order deleting all references to defendant as "a/k/a Dirty Red". The trial court apparently granted the order *ex parte* and failed to give notice to plaintiff. The order provided that the court files be reformed to delete all references to the alias. Further, the court ordered "[t]hat in all future proceedings the court and the prosecutor's office will refrain from including the a/k/a 'Dirty Red' ".

During plaintiff's opening statement, the following interchange took place:

"The People will prove in this case that on July 12, 1972 in the Derby Bar on East Ann Street, right over there (indicating) in the City of Ann Arbor, the County of Washtenaw, that the Defendant; James Amison also known as—

"*Mr. Henry:* (Interposing) Objection, your Honor. We have been over that particular matter in this case on several different occasions.

"That was stricken from the file at the request of the Court.

"*The Court: I will strike the reference at this time but if it properly comes out on evidence, we will have to handle that again.*

"*Mr. Henry:* Thank you, your Honor." (Emphasis supplied.)

During the testimony of an Officer West, the prosecutor asked West to relate to the jury whether he knew defendant by any other name. Defense counsel objected on the basis of materiality and the lack of a proper foundation. Counsel did not, however, claim that the answer would be in violation of the pretrial order. The trial court overruled the objection and allowed West to answer that he knew defendant as "Dirty Red", since he was introduced to defendant by that name.

We find no error in the admission of this answer, either based on evidentiary considerations or on the court's own order. The admissibility of evidence is a matter consigned to the discretion of the trial court. *People v Deblauwe,* 60 Mich App 103; 230 NW2d 328 (1975). We find no abuse of that discretion here. Officer West's knowledge of defendant as "Dirty Red" was probative in that it displayed the officer's familiarity with defendant and added to his explanation of the res gestae. While, as defendant argues, the name "Dirty Red" may not indicate an individual of the best character, its introduction cannot be deemed so prejudicial as to completely outweigh its probative value. See *People v Basemore,* 36 Mich App 256; 193 NW2d 335 (1971).

We find no merit in defendant's claim based on the court's order. The language of the pretrial order is subject to the interpretation that the court meant it to prohibit the use of defendant's alias only in the court files. The emphasized portion indicates that the court did not intend its order to restrict the testimony of witnesses. We presume that the court knew the intent of its order and enforced it accordingly. Further, defense counsel's failure to object to West's testimony on the basis that it was in violation of the pretrial

order, rather basing his objection upon materiality and lack of foundation, lends additional weight to the conclusion that the order was never intended to restrict the testimony of witnesses.

We similarly reject defendant's assertion that a police officer's description of him as a major drug supplier constituted reversible error. The answer was made in response to a defense question which defense counsel should have anticipated would cause this very response. We refuse to consider such invited error. *People v Collins,* 63 Mich App 376; 234 NW2d 531 (1975). Defendant also challenges as reversibly inflammatory certain statements made by the prosecutor during his closing argument. In its full context, the challenged statements represent a proper, non-prejudicial response to statements made during defense counsel's closing argument.

Defendant's second assertion of error is that the trial court committed reversible error by allowing the investigating officers to relate remarks made by defendant to an undercover policeman at the time of the alleged sale of heroin. The undercover policeman had been outfitted with a transmitting device, and his transaction with defendant was monitored and recorded by other officers. Defendant objected to this testimony because police did not procure a warrant prior to engaging in the monitoring. As defendant notes, the Supreme Court promulgated a warrant requirement for such monitoring in *People v Beavers,* 393 Mich 554; 227 NW2d 511 (1975), *cert den* 423 US 878; 96 S Ct 152; 46 L Ed 2d 111 (1975). However, Beavers was accorded expressly prospective treatment and, as such, does not apply here. Panels of this Court have split on the application of a warrant requirement to pre-*Beavers* electronic monitoring. One

panel imposed such a requirement in *People v Plamondon,* 64 Mich App 413; 236 NW2d 86 (1975), *lv granted* 395 Mich 813 (1975). Other panels have refused to do so. *People v Pulley,* 66 Mich App 321; 239 NW2d 366 (1976), *People v Livingston,* 64 Mich App 247; 236 NW2d 63 (1975). We choose to follow the latter precedent and rule that no error was committed in the instant case.

Defendant's final and most meritorious claim also relates to the monitoring activity. It was brought out at trial that the police had lost the tape made of the alleged heroin sale. Despite the absence of the tape, several officers testified, over defense objection, to what they heard while monitoring the transaction. Defendant now claims that the negligent loss of the tape denied him a fair trial in violation of his due process rights and deprived him of his Sixth Amendment right to fully cross-examine witnesses against him.

In response to this serious allegation, plaintiff blithely asserts that defendant's "argument is completely esoteric". We find it interesting that plaintiff considers fundamental constitutional rights "esoteric". Perhaps plaintiff also finds too esoteric for comprehension the GCR 1963, 814.3 requirement that he respond in a comprehensive and authoritative manner to claims made in appellant's brief. This Court and the people of Washtenaw County are ill-served by plaintiff's argument, one which cites no authority except an anonymous and invalid old English homily and relies instead on the personal feelings of the writer. We have reprinted plaintiff's argument in the appendix. No further criticism is necessary. We do, however, take this opportunity to remind plaintiff's appellate counsel that a brief should not be confused with an affidavit, and legal arguments with personal reminiscences.

The United States Supreme Court detailed the constitutional impact of evidence lost through actions of the police or prosecutor in *Brady v Maryland,* 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963). Such a loss is deemed a "suppression" regardless of intent. In *Brady,* the court focused on the harm caused by such suppression rather than on the intent which caused the loss of evidence. The *Brady* Court held that:

"the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment *irrespective of the good faith or bad faith of the prosecution." Id,* at 87. (Emphasis supplied.)

Under the *Brady* line of decisions, the important factors to be considered on appeal are:

"(a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence."

*Moore v Illinois,* 408 US 786, 794–795; 92 S Ct 2562; 33 L Ed 2d 706 (1972), *reh den* 409 US 897; 93 S Ct 87; 34 L Ed 2d 155 (1972), *People v Drake,* 64 Mich App 671, 681; 236 NW2d 537 (1975). Evidence is material if the evidence "could * * * in any reasonable likelihood have affected the judgment of the jury". *Napue v Illinois,* 360 US 264, 271; 79 S Ct 1173; 3 L Ed 2d 1217 (1959). Favorable evidence is defined as all "evidence which * * * might have led the jury to entertain a reasonable doubt about * * * guilt". *Levin v Katzenbach,* 124 US App DC 158, 162; 363 F2d 287, 291 (1966). These tests should be liberally construed especially when "substantial room for doubt" exists as to the effect disclosure might

have. *United States v Bryant,* 142 US App DC 132, 138; 439 F2d 642, 648 (1971). See also *People v Eddington,* 53 Mich App 200; 218 NW2d 831 (1974).

In the instant case, defendant made a request for the tape. It is clear that the missing tape would have been material to the case inasmuch as it might have affected the credibility of key prosecution witnesses. Whether the tape could have been exculpatory is difficult to determine. In determining whether suppression of evidence requires the vitiation of a defendant's conviction, a growing number of cases have applied a variable standard. See Anno., *Withholding or Suppression of Evidence by Prosecution in Criminal Case As Vitiating Conviction,* 34 ALR3d 16, 68–71. These cases have examined numerous factors bearing on the harm caused by the loss of evidence. Specifically, courts have weighed "the degree of negligence or bad faith involved, the importance of the evidence lost, and the evidence of guilt adduced at trial". *United States v Bryant, supra,* at 653. More flagrant prosecutorial conduct requires less of a showing of prejudice by defendant.

In *United States v Keogh,* 391 F2d 138 (CA 2, 1968), the variable standard is delineated into three types of situations:

1. Where the prosecution has deliberately suppressed evidence which is favorable to the defense, prejudice will be presumed.

2. Suppression of evidence where defendant has requested its production, but the prosecutor and trial court deny his request. If such evidence is material to either guilt or punishment and is exculpatory, due process has been denied irrespective of the prosecutor's good or bad faith.

3. Where suppression is not deliberate and de-

fendant has not requested the evidence, but "hindsight discloses that the defense could have put the evidence to not insignificant use", defendant will be held to a "considerably higher" standard of materiality. *Id,* at 147. See also *People v Dorsey,* 45 Mich App 230; 206 NW2d 459 (1973), *lv den,* 389 Mich 793 (1973).

Other courts which have considered the due process ramifications of lost tape recordings have reached varying conclusions. They have concentrated on the importance of the evidence and on the quality of police and prosecutorial conduct. See *Younie v State,* 19 Md App 439; 311 A2d 798 (1973), *revd on other grounds,* 272 Md 233; 322 A2d 211 (1974), *The City of Seattle v Fettig,* 10 Wash App 773; 519 P2d 1002 (1974), *Trimble v State,* 75 NM 183; 402 P2d 162 (1965), *United States v Bryant, supra.*

This Court has uniformly held that, absent intentional suppression or a showing of bad faith, the loss of evidence which occurs before a defense request for it does not mandate reversal. *People v Eddington, supra, People v Bendix,* 58 Mich App 276; 227 NW2d 316 (1975), *People v McCartney,* 60 Mich App 620; 231 NW2d 472 (1975). This Court has also held that the intentional destruction of tape recordings, where the purpose is not to destroy evidence for a forthcoming trial, does not mandate reversal. *People v Hardaway,* 67 Mich App 82; 240 NW2d 276 (1976). It is only where this Court has found that there was no effort made to preserve the evidence initially, *People v Anderson,* 42 Mich App 10; 201 NW2d 299 (1972), *remanded on other grounds* 391 Mich 419; 216 NW2d 780 (1974), or where there was the possibility that certain test results may have been actually suppressed, *People v Drake, supra,* that this Court has

found possible suppression mandating reversal. In *Anderson* and *Drake,* hearings were required to determine the quality of plaintiff's conduct and the nature of the lost evidence.

In the instant case, no such hearing is required. The facts requisite to our determination of defendant's due process claim are of record. At trial, Detective Henderson, one of the officers who had monitored the transaction, testified that the tape recording was placed in a lock sealed evidence envelope and placed in a safe in the Ypsilanti office of the Washtenaw Area Narcotics Team (WANT). Anderson then related that he attempted to obtain the tape from the person who was in charge of the WANT unit at the time of trial and was informed by that person that it was not in the safe. A similar check with the Detroit office produced the same result.

On cross-examination, after indicating that narcotics are logged in, accompanied by a signed receipt and transferred to the Plymouth Crime Lab, Anderson indicated that tapes are not logged in, but rather a copy of the property form is attached to the police report indicating there is a tape in the safe. This procedure was not followed, however, in the case of the instant tape. Rather, there was an indication on the police report itself showing that there was a tape. Anderson did not know whether a receipt was filled out by his partner, Detective Chappel.

Chappel testified that he placed the tape in a lock seal envelope, after having initialed the tape itself, and placed the envelope in the safe in the WANT office. He indicated that no "evidence" is kept in that safe. The tape was considered an "investigative aid". Chappel reiterated that he filled out the lock seal envelope and placed the

envelope in the office safe for safe keeping. There was never any intent to transmit the tape to the crime lab. His intent in placing it in the office safe was to preserve it, because he considered it to be important. Chappel last saw the envelope in the safe in August or September of 1973, just before he left the WANT unit. Chappel did not make out an evidence form with respect to the tape.

Anderson was recalled and indicated that he had last seen the envelope in the safe in the spring of 1973, just prior to his departure from the unit. Anderson reiterated that the police report contained the notation that there was a tape and that it would be retained as evidence.

James Henderson, the detective in charge of the WANT unit at the time of trial, was called. Henderson indicated that he attempted to locate the envelope in question in the WANT office safe, but he was unable to find it. A check with the Detroit office yielded similar negative results. Henderson surmised that the tape might have been inadvertently destroyed when material dealing with closed complaints was destroyed. Henderson indicated that, since the tapes have no monetary value and are treated as investigative aids, property receipts normally are not made out for the tapes. The normal procedure is merely to put them in a lock seal envelope. Henderson did indicate that when he took over the office there were several packages of tapes in the safe, some of which were very old. Therefore, he ordered a search of the tapes to determine which were valuable and the destruction of those which were no longer valuable.

We find that these facts do not constitute a denial of due process and do not require us to vacate defendant's conviction. The evidence shows carelessness on the part of the police. It does not

disclose gross negligence or intentional suppression. Defendant argues that the failure to make out an evidence receipt and the failure to send the tape to the crime lab for safekeeping, coupled with the fact that the police viewed the tape as being an investigative aid rather than evidence, constituted a failure to take reasonable steps to preserve the tape. We disagree. The filling out of a property receipt would in no way have better preserved the evidence than did the sealing of the envelope with a written notation of its contents and a notation on the police report that the tape was being retained. A record receipt could have only served to denote the nature of the evidence and the fact that the evidence was being held for safekeeping, which is exactly what the envelope notation and the report notation did.

Likewise, we find nothing to indicate that storage at the crime lab is inherently safer than storage in the safe at the WANT unit office. Certainly, given the advantage of hindsight, it may be said that it is probable that had this tape been sent to the crime lab it probably would not have been inadvertently destroyed. However, this is not to say that crime lab storage is so inherently safer than storage in the WANT unit safe was unreasonable. Further, given the unusual nature of this evidence, it would not seem to be unreasonable to use a different method of safekeeping from that used for narcotics, firearms and other physical evidence. The tape being more in the nature of confessions, statements, and reports, it does not seem unreasonable to store them at the location of the local unit. Finally, it is not how the police officer chose to characterize the tape, but rather the efforts undertaken to preserve it that are dispositive. Thus, the mere fact that they viewed

the tape as an "investigative aid" rather than evidence is of no consequence, if they made adequate efforts to preserve it.

As we noted above, because the tape was lost, we cannot make a precise determination as to its inculpatory or exculpatory nature. However, the trial court was able to adjudge the demeanor and credibility of the police witnesses who described the contents of the tape. The court's ruling on the defense motion constitutes a finding that the police truthfully represented the transaction. We find nothing to dispute this finding or to require a hearing at which the same testimony would be received.

We find *People v Eddington, supra,* dispositive of defendant's claim that the loss of the tape deprived him of his Sixth Amendment right to confront witnesses against him. See also *People v Triplett,* 68 Mich App 531; 243 NW2d 665 (1976).

For the reasons stated above, we affirm defendant's conviction.

J. H. GILLIS, J., concurs in the result only.

APPENDIX

"ARGUMENT

"QUESTION III

"This argument is completely esoteric. It is true that the tape recordings were lost, however, I submit that this was the evidence most favorable to the Defendant. The Court must keep in mind that this was the era of Watergate wherein tape recordings received much ado by everyone in this nation. The State Police had to come in and tell the jury that they had lost the tape, thus putting them in an unenviable position.

"As the English Courts have oft stated: 'Just because the constable bungles, does not mean that the crook should go free'. The lost tape recording was a circumstance that I am sure the twelve tried and true considered at great length just as I am sure the twelve tried and true considered the two chemistry volumes that defense counsel Henry put before them to try and develop a reasonable doubt that was in fact nonexistent."