*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
February 10, 2025
1:22 PM

Plaintiff-Appellee,

v

No. 361987
Eaton Circuit Court
LC No. 2019-020365-FC

DINEANE ROCHELLE DUCHARME,

Defendant-Appellant.

Before: BORRELLO, P.J., and REDFORD and PATEL, JJ.

PER CURIAM.

Dineane Rochelle Ducharme, hereinafter defendant, appeals as of right her convictions for first-degree murder, MCL 750.316; conspiracy to commit first-degree murder, MCL 750.316; MCL 750.157a; and mutilation of a dead body, MCL 750.160. She was convicted following a jury trial and sentenced to life imprisonment without the possibility of parole for her murder and conspiracy convictions and 23 to 120 months' imprisonment for her mutilation of a dead body conviction. For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

This case involves a brutal murder that went unsolved for nearly 20 years. On May 8, 2002, Gordon DeVries found a dead body on his 60-acre property in Grand Haven Township, which included a commercial blueberry farm and wooded areas. DeVries noted that the trees near the body appeared to be "scorched." He had visited the property the day before and had not noticed anything unusual. After discovering the body, DeVries promptly reported it to the police.

Detective Robert Donker of the Ottawa County Sheriff's Office visited the property and testified that he observed "a significant amount of fire and burning" in that area. Inside a metal box or trunk, which was located in the center of the burned area, lay a body. Donker also detected the smell of "some type of flammable liquid." Marks on the surrounding trees indicated that the flames had reached approximately 10 feet in height at one point. Additionally, a partially burned fiberglass claw hammer was discovered next to the box amid the ashes.

-1-

Dr. Stephen Cohle, Chief Medical Examiner for Kent County and Deputy Chief Medical Examiner for Ottawa County, performed the autopsy. Dr. Cohle explained that rope segments were recovered from the back of the victim's neck and that the rope had been burned from the front, indicating to him that the rope may have been wrapped around the neck of the victim. A baseball bat, broken into two main pieces was also found near the body together with pieces of a plastic bag behind and next to the victim's head, face and lower back. Dr. Cohle testified that from his examination, he determined that the victim had been severely burned and had suffered severe head trauma. He testified that the extent of the burning may have totally destroyed certain superficial injuries the victim may have suffered and that "the characteristics of even more severe injuries, such as their exact length and so on, [were potentially] difficult or impossible to determine."

Dr. Cohle found that the victim had suffered four severe injuries to the left side of the head and another severe injury to the right side of the back of the head, all of which had been caused by a blunt object. He determined that there was one area on the left side of "depressed fracturing from an external blow that has driven bone into the skull for, it looks like, almost an inch" to come in contact with the brain. He also determined that a circular area of depressed fracturing on the left side consisted of "three almost overlapping skull fractures." Dr. Cohle described the circular edge and "scalloping" of these fractures, which he opined was consistent with having been caused by blows from the round, nail-driving end of a hammer. There was also extensive bruising of the brain from blunt force injury. From this evidence, Dr. Cohle concluded that there were four distinct depressed fractures of the skull, each of which was caused by a hammer consistent with the hammer that was found near the body. He further indicated that the upper one of these four fractures was "relatively shallow" and that the three lower ones overlapped, with the middle of those three showing the "most evidence of bone being driven in." The fifth injury, to the right side of the head, did not cause a fracture to the skull and could have been caused by another object such as a baseball bat.

Dr. Cohle stated that the death was a homicide and that the victim died from head injuries. He indicated that the victim would have died within minutes of sustaining those injuries, and that the death could have been slightly accelerated if the victim had been suffocated with a plastic bag after the head trauma. Dr. Cohle also concluded that the victim was already deceased at the time of the fire, as there was no evidence of soot in the victim's airway and no carbon monoxide detected in the victim's blood. At the time the autopsy was completed, the victim had not been identified.

Donker testified that the body remained unidentified for several years, and the case became known as the "Jack in the Box" case. On April 23, 2015, Donker received an email from defendant indicating that she might have information about this case. Donker eventually spoke to defendant by telephone, during which she explained that she believed the victim was Roberto Caraballo. Roberto had been married to defendant's mother and lived with them in Michigan in 2002. Donker was able to verify Roberto's identity through dental records and federal prison records. [1] Additionally, it was discovered that Roberto had been living in Charlotte, Michigan, in May 2002.

---

[1]Police were later able to confirm that Roberto was also known as Juan Ramon Cintron.

Sicily Caraballo, Roberto's daughter, testified that in 2002, when she was nine years old, she lived in Charlotte, Michigan, with Roberto and her family. The other family members residing in the house included Beverly Ducharme,[2] Beverly was Sicily's mother, and Tasha, Sicily's half-sister, was approximately 22 months older than Sicily. Defendant is also Sicily's half-sister, as Beverly is the mother of both the defendant and Sicily. In 2002, defendant was in her early twenties and lived with the family in the Charlotte home intermittently. Defendant's friend, Chris McMillan, occasionally stayed at the house as well.

Sicily testified that Roberto disappeared when she was nine years old. She recalled that the last time she saw him, she had just come home from school, and her mother told her to go to the neighbor's house to bake cookies. Though Roberto wanted her to stay home, she decided to go and bake cookies with her friend instead. Sicily also remembered being "rushed in the middle of the night" and placed into the family's van along with Tasha, the defendant, and Beverly. They traveled in the van for "quite some time," and Sicily eventually fell asleep in the back seat. She later testified that she next remembered waking up to "an explosion." When she looked out the back window of the van, she saw defendant running from a burning, wooded area, trying to catch up with the moving van. After that, Sicily went back to sleep.

The next morning, when she woke up at her house, Sicily noticed that Roberto's personal belongings were missing and there was a padlock on the basement door. Sicily never saw Roberto again and was told that he had left the family and gone to Canada. She found it strange that Roberto's vehicles were still in the driveway.

After the victim had been identified as Roberto, Donker spoke to defendant by telephone and she indicated that she thought Beverly may have killed Roberto. Because of the location of Roberto's 2002 residence, the Eaton County Sheriff's Office also became involved in the case.

Defendant was living in Texas when she called the police, so Donker and Detective James Maltby from the Eaton County Sheriff's Office traveled there to meet her. Donker testified that defendant claimed her memories of the events in question were negatively affected by her drug use at the time. However, she remembered that Beverly and Roberto had an argument on the night of May 7, 2002, and that Roberto "escaped" the argument by going to the basement. Donker further testified that she mentioned Beverly became increasingly angry, stating she was "gonna kill him." Following this, Beverly went downstairs, returned a few minutes later, and announced that she had killed Roberto. Defendant also stated that her friend Chris would know what happened because he was present that night. An audio recording of this interview was played for the jury.

The following day, on October 22, 2015, Donker and Maltby conducted a second interview with defendant at the sheriff's office in Galveston, Texas. During this interview, Maltby informed her that numerous traffic cameras were in Ottawa County and asked if camera footage would show her driving the vehicle on the night of Roberto's death. Defendant admitted that she might have been driving at some point. Additionally, she acknowledged during the second interview that she had gone partway down the stairs that night and had seen some of Roberto's body and blood in the

---

[2] Beverly Ducharme is also known by several aliases, including Beverly McCallum and Beverly Magligetti. For simplicity, she will be referred to as "Beverly."

basement. Both Donker and Maltby corroborated these statements. Although a video and audio recording of this interview were made, the recording was lost before the trial. According to Maltby, defendant provided essentially the same information in the second interview as in the first, with her admissions regarding seeing Roberto's body in the basement and driving the vehicle that night being the only new information.

Based on this information, a search of the basement of the family's former home in Charlotte, Michigan, was conducted. During this search, Maltby observed a concrete "patch" in the floor that appeared to be newer than the rest of the basement and white paint scattered randomly on some of the support beams near the concrete patch. Personnel from the Michigan State Police Crime Lab were called to the site to conduct further testing for evidence of blood in the basement. Portions of the concrete patch were chipped up, and evidence of potential blood traces was found on the side of the staircase, on the concrete surrounding the patch, beneath where the concrete patch had been, and on portions of support posts covered in white paint. These areas were swabbed to retrieve DNA. Lab analysts determined that human blood had been found in the basement, which contained DNA. Further testing indicated a high statistical probability that Roberto was more likely than not a contributor to the mixed DNA profile obtained from the area beneath the concrete patch.

Eventually, Maltby was able to locate Chris McMillan through Facebook searches and an old photograph provided by Sicily. Maltby learned that McMillan was living in Grand Rapids, Michigan, and he and another officer went to McMillan's residence. During their conversation, McMillan admitted his involvement in the murder. McMillan implicated himself as well as defendant. He testified at her trial as part of a plea agreement.[3]

McMillan testified that in early 2002, he spent time with defendant and Beverly at the house in Charlotte. He testified that about a week before Roberto was killed, defendant and Beverly told him they wanted to "get rid of" Roberto due to his abuse of Beverly and the children. McMillan observed that the children seemed "skittish," and that Beverly and Roberto frequently argued, noting that Beverly's mascara was often "running" as if she had been crying. According to McMillan, defendant and Beverly planned to kill Roberto by "knocking him over the head and suffocating him." Later, while McMillan and defendant were in the basement getting high, they discussed that the plan was for McMillan to use a wooden baseball bat that was in the basement to "knock him (Roberto) out," after which defendant and Beverly would suffocate him by placing a bag over his head. Beverly came down to the basement to confirm that everyone knew the plan.

On the day of the murder, McMillan and defendant were "smokin" in the basement. McMillan testified that the door to the basement opened, and Beverly "kicked" or "pushed" Roberto down the stairs. He landed at the bottom of the stairs, and McMillan swung the baseball

---

[3] Initially, McMillan was charged with open murder, conspiracy to commit open murder, and defacing a dead body. In exchange for his testimony against defendant, he was allowed to plead guilty to second-degree murder and conspiracy to commit second-degree murder, receiving a minimum sentence of 15 years in prison.

bat. The bat hit a post and broke into "a couple pieces." McMillan testified that he hit the post because he did not really want to hit Roberto. McMillan continued:

> He really didn't get up. He was reachin' for [defendant] that was in front of him. I didn't hit him with the bat, but he was not quite gettin' up.

> So, Beverly asked -- she was yelling, "Give me the hammer. Give me the hammer." So, [Defendant] had the hammer. She kinda swung a couple times and really didn't do anything. And Beverly got the hammer from her, and she commenced to hittin' him on the left side of the head and put the hole with the hammer in his head.

McMillan clarified that defendant struck Roberto "a couple times" on the head with the hammer before giving it to Beverly. Beverly hit Roberto so hard that the round part of the hammer penetrated his skull. McMillan removed the hammer from Roberto's skull, and defendant and Beverly used a rope to tie a bag over Roberto's head. McMillan stated that Beverly was on Roberto's chest and defendant held his head with the rope. Eventually, McMillan saw the bag stop "goin' in and out" when Roberto stopped breathing.

McMillan changed his clothes and went to buy cleaning supplies, including bleach, ammonia, and gloves. He testified that there "was a lot of blood." However, McMillan did not help clean up the basement and stayed upstairs while Beverly and defendant cleaned up the blood. McMillan then went to pick up Sicily and Tasha from school. They were sent to their bedroom, and a padlock was placed on the basement door. Late that night, after Beverly and defendant had placed Roberto inside a trunk that had previously been next to Beverly's bed, McMillan and defendant carried the trunk containing Roberto's body out of the basement and put it into the trunk of Roberto's van. Defendant and McMillan put Sicily and Tasha, who were asleep, in the backseat of the van, and Beverly, defendant, McMillan, Sicily, and Tasha all left in the van. Defendant drove. First, they went to a nearby gas station and filled up both the van and a separate gas can. Then they drove on the highway for over 45 minutes, although McMillan did not know where they went. Beverly told defendant where to drive.

They stopped at a gate at the end of a dirt road and unloaded the trunk with Roberto's body inside. McMillan and defendant dragged the trunk down the dirt road and then went back to the van to retrieve the gas can. Then Beverly and McMillan poured gas on the body and lit it on fire. Beverly, McMillan, and defendant ran from the fire and got back into the van. As they drove home, the three of them threw their shoes out the windows of the van.

After returning home, Beverly told McMillan and defendant to chip up the concrete in the basement and pour new concrete over the dirt where there was still blood. McMillan and defendant complied, chipping up the concrete with a hammer different from the one used to kill Roberto. They placed the concrete chips in a bucket along with the clothes they had worn during the murder. Then they poured new concrete over the area. McMillan and defendant also put white paint on various posts in the basement, as directed by Beverly, to cover remaining blood stains. They disposed of the bucket of clothes and concrete in the dumpster at a local car wash.

Defendant was convicted and sentenced as previously stated. She now appeals.

## II. LOST INTERVIEW TAPE

Defendant argues on appeal that she was denied her due-process right to a fair trial because Maltby was allowed to testify about the content of defendant's October 22, 2015, interview with Maltby and Donker, despite the fact that the recording of that interview was lost before the trial due to Maltby's negligence. Defendant contends that Maltby failed to preserve evidence that could have been potentially useful to her defense, and therefore, his testimony regarding the interview should have been excluded. Additionally, defendant claims she was denied a fair trial because the trial court refused to provide a special instruction allowing the jury to draw a negative inference against the prosecution for the negligent loss of the interview recording. Defendant maintains that the trial court erred in determining that such an instruction was only warranted if the negligent actions were done in bad faith.

An alleged due process violation presents this Court with a constitutional question that is reviewed de novo. *People v Smith*, 498 Mich 466, 475; 870 NW2d 299 (2015). For claims of instructional error, we review de novo any questions of law presented and we review the trial court's ultimate decision whether to give the instruction under the particular circumstances for an abuse of discretion. *People v Dupree*, 486 Mich 693, 702; 788 NW2d 399 (2010). " 'An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes.' " *People v Guajardo*, 300 Mich App 26, 34; 832 NW2d 409 (2013), quoting *People v Unger*, 278 Mich App 210, 217; 749 NW2d 272 (2008).

Defendant objected to the admission of any testimony concerning her interview with Donker and Maltby, which occurred on October 22, 2015, unless the recording of that interview was made available. The trial court conducted a brief evidentiary hearing on the issue, away from the jury, during which it questioned Maltby about the recording.

Maltby testified at the evidentiary hearing that he brought the DVD recording of the interview from Texas back to Michigan and placed it in his office, located in the basement of the sheriff's office. At some point afterward, he was unable to locate the recording. There had been flooding in his office shortly after his return from Texas, which resulted in many items being discarded. He presumed that the DVD was thrown away along with other wet items due to the flooding. Maltby stated, "I should have immediately come back, made a copy, and booked it into evidence." However, he did not make a copy of the DVD or submit it as evidence before it was lost. Although Maltby could not recall exactly when he discovered the DVD was missing, he believed it was relatively soon after the interview was conducted.

Defense counsel asked Maltby during this hearing whether "there was anything that was stated by the defendant that could reasonably . . . be construed as mitigating in nature or favorable to her?" Maltby responded:

> Not -- not that I remember. The -- I remember it. It was, basically, a synopsis, a shortened version, with less interruptions of the very first interview we did with her at her residence. . . .

\* \* \*

-6-

. . . I just remember it was a shorter, condensed version of, basically, the first interview.

Maltby clarified that there were "a couple things, a few things that were, you know, added on . . ." The prosecutor then questioned him as follows:

> *Q.* These items in this second interview, you just said that there were just a couple of things. What were the additional couple things that -- that you did, that you remember specifically about that interview compared to the first interview?
>
> *A.* The differences between the two, the second one, as opposed to the first one, I remember the defendant mentioned seeing the victim's legs by the bottom of the basement stairs, layin' on the floor. Basically indicating she saw a part of his dead body.
>
> The other thing was, when we were talkin' about transporting the body, I— I kind of bluffed her and indicated that Ottawa had pulled tons of traffic cam footage. And when I got a chance to review all that footage, was that gonna show me her driving—driving the van that was transporting the body, and she said, "Oh, it—it might. I might've drove for por—for a portion of the trip."
>
> *Q.* Other than those two points, was there really anything different than what you had heard in your first interview?
>
> *A.* No, not really.
>
> *Q.* And these items that you just spoke about, did you make a report about that and put that in the report?
>
> *A.* Yes.

Citing *People v Amison*, 70 Mich App 70; 245 NW2d 405 (1976),[4] and MRE 1004,[5] the trial court ruled that the detectives could testify about the substance of the interview and that defense counsel could cross examine them regarding their memories and any perceived discrepancies in their reports on the interview, which would go to the weight and credibility of the testimony. As described *supra*, both Donker and Maltby testified in front of the jury about the two statements defendant made during the October 22, 2015, interview that were additions to her statements from the October 21 interview.

---

[4] As will be more fully addressed in this opinion *infra*, this Court held in *Amison* that "absent intentional suppression or a showing of bad faith, the loss of evidence which occurs before a defense request for it does not mandate reversal." *Amison*, 70 Mich App at 79.

[5] MRE 1004 has been amended since the time of trial. 512 Mich cxli (2023). The changes appear to be stylistic, but they are not at issue in this appeal.

Although the trial court initially indicated that it would give a negative inference instruction, the trial court subsequently ruled that it would not give the negative inference instruction because there was no evidence of bad faith on the part of the law enforcement officers or prosecution and the evidence had ceased to exist before charges were initiated against defendant and before it was requested by defendant.

On appeal, defendant argues that there was a negligent failure to preserve evidence that could have been potentially beneficial to the defense. As a result, she contends that Maltby's testimony regarding the contents of the interview conducted on October 22, 2015, should have been suppressed. Our Supreme Court has clearly outlined the legal framework relevant to an alleged *Brady* violation thusly:[6]

> The Supreme Court of the United States held in *Brady* that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." [*Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963).] In identifying the essential components of a *Brady* violation, the Supreme Court has articulated a three-factor test:
>
> > The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.
>
> Stated differently, the components of a "true Brady violation," are that (1) the prosecution has suppressed evidence, (2) that is favorable to the accused, and (3) that is material.
>
> The parameters of these three factors are fairly well established. The government is held accountable for evidence within its control, even if that evidence is unknown to the prosecution, regardless of whether the prosecution acted in good or bad faith. Evidence is deemed favorable to the defense if it is either exculpatory (clearing the defendant of guilt) or impeaching (challenging the credibility of a witness).
>
> To demonstrate materiality, a defendant must show that "there is a reasonable probability that, if the evidence had been disclosed to the defense, the outcome of the proceeding would have been different. A 'reasonable probability' is deemed sufficient to undermine confidence in the outcome." This standard "does not require proof by a preponderance that the disclosure of the suppressed evidence would have ultimately led to the defendant's acquittal." The key question is whether, without

---

[6]violation of *Brady v. Maryland*, 373 U.S. 83; 83 S. Ct. 1194; 10 L. Ed. 2d 215 (1963).

the suppressed evidence, the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence."

> In assessing the materiality of the evidence, courts are instructed to consider the suppressed evidence as a whole, rather than examining it in isolation. [*People v Chenault*, 495 Mich 142, 149-151; 845 NW2d 731 (2014) (some citations omitted; ellipsis in the original).]

Here, it is undisputed that defendant never received the recording of her interview from October 22, 2015, and that this recording was lost before the defense counsel ever made a request for the tape. Nonetheless, there is no evidence suggesting that the recording contained any information that would have been beneficial to defendant. According to Maltby, he did not recall anything from the interview that would have supported the defendant's case. We note that defendant's argument on this issue relies solely on unproven speculation that the recording *may* have included "information that could have been favorable to the defense."

The United States Supreme Court has addressed the issue that arises when a *Brady* claim is based on evidence that no longer exists due to the government's failure to preserve it. *In Arizona v. Youngblood*, 488 US 51, 58; 109 S Ct 333; 102 L Ed 2d 281 (1988), the Court held that "unless a criminal defendant can show *bad faith* on the part of the police, the failure to preserve *potentially useful* evidence does not constitute a denial of due process of law" (emphasis added). The *Youngblood* Court reasoned that, although the government's good or bad faith is "irrelevant" under *Brady* when the government "fails to disclose to the defendant material exculpatory evidence," the "Due Process Clause requires a different outcome when we consider the failure of the State to preserve evidentiary material that, at best, may have exonerated the defendant" *(Id*. at 57, emphasis added).

> Part of the reason for the difference in treatment is found in the observation . . . that "[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." Part of it stems from our unwillingness to read the "fundamental fairness" requirement of the Due Process Clause as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution. We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.*, those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant. [*Id*. at 57-58 (citations omitted; alteration in original).]

In *Amison*, 70 Mich App at 79, we stated that this Court had "uniformly held that, absent intentional suppression or a showing of bad faith, the loss of evidence which occurs before a defense request for it does not mandate reversal." In that case, the defendant was convicted of

delivery of heroin. *Id*. at 72-73. The defendant's heroin sale involving an undercover police officer had been recorded by the undercover officer, but the recording had been lost by the police before trial. *Id*. at 75-76. Apparently, officers had placed the tape recording in a lock sealed evidence envelope and in an office safe, but the tape was no longer in the safe when an officer attempted to retrieve it at the time of trial. *Id*. at 80. It was presumed that the tape was "inadvertently destroyed" while disposing of old materials from closed complaints. *Id*. at 81. Despite the loss of the recording, multiple officers were permitted to testify at trial, over the defendant's objection, "to what they heard while monitoring the transaction." *Id*. at 76. This Court rejected the defendant's appellate argument that the negligent loss of the tape denied him his due-process right to a fair trial, reasoning that the evidence demonstrated carelessness by the police, not intentional suppression or gross negligence. *Id*. at 76, 81-82.

In contrast, in *People v Albert*, 89 Mich App 350, 351, 354; 280 NW2d 523 (1979), this Court reversed the defendant's conviction and granted a new trial because a police officer committed misconduct by intentionally destroying a tape-recorded statement made to the officer by a prosecution witness that the officer knew was beneficial to the defendant. In that case, the defendant's accomplice in the robbery of which the defendant was convicted testified against the defendant at trial pursuant to a plea bargain that allowed the accomplice to plead guilty to a lesser charge. *Id*. at 351-352. Before trial, the accomplice had made two separately recorded statements to the same police officer. *Id*. at 352. In the first statement, the accomplice confessed and relayed the events of the night in question without indicating that the defendant participated. *Id*. In the second statement, the accomplice implicated the defendant. *Id*. The officer discarded the first taped confession because it "wasn't anything that [the officer] wanted to hear." *Id*. at 352-353. The officer also acknowledged that the defendant would probably want to hear the tape, but it no longer existed. *Id*. at 353-354. This Court held that the officer's conduct constituted bad faith for purposes of the rule stated in *Amison* and that reversal of the defendant's conviction was required. *Id*. at 354.

Here, the facts are similar to those in *Amison*. Like the officers in *Amison*, Maltby intended to preserve the interview recording by placing it in his office, without anticipating that it would be inadvertently destroyed. There is no evidence of bad faith or intentional suppression regarding the loss of the recording, which the defendant concedes was only *potentially* useful. Consequently, defendant has failed to establish a due-process violation. (See *Youngblood*, 488 US at 57-58; *Amison*, 70 Mich App at 79).

Regarding the request for a negative inference instruction, defendant has not demonstrated that the trial court abused its discretion by refusing to provide this instruction. The trial court's decision was justified because there was no evidence of intentional suppression or bad faith. This aligns with the our ruling in *People v. Davis*, 199 Mich App 502, 514-515; 503 NW2d 457 (1993), overruled in part on other grounds by *People v. Grissom*, 492 Mich 296, 320; 821 NW2d 50 (2012), which stated that a negative inference instruction is not warranted when the prosecution fails to produce evidence that no longer exists, provided there is no evidence of bad faith on the part of the prosecution.

### III. APPEALS TO JUROR SYMPATHY

Defendant contends that her constitutional right to a fair trial was breached due to prosecutorial misconduct, specifically citing improper attempts to evoke sympathy from the jurors. She argues that these manipulative appeals undermined the integrity of the judicial process and skewed the jury's perception, compromising her ability to receive an impartial trial.

"Review of alleged prosecutorial misconduct is precluded unless the defendant timely and specifically objects, except when an objection could not have cured the error, or a failure to review the issue would result in a miscarriage of justice." *Unger*, 278 Mich App at 234-235 (quotation marks and citation omitted). Here, as defendant concedes, defendant did not object to any of the alleged instances of prosecutorial misconduct. This issue is unpreserved. *Id.*

When a claim of prosecutorial misconduct has not been preserved "by contemporaneous objections and requests for curative instructions, appellate review is for outcome-determinative, plain error." *Unger*, 278 Mich App at 235. Under the plain error rule, defendant has the burden to show that (1) error occurred; (2) the error was plain, meaning clear or obvious; and (3) the plain error was prejudicial because it "affected the outcome of the lower court proceedings." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). If a defendant satisfies these three requirements, the appellate court must exercise its discretion in determining whether to reverse, and reversal is only justified if the defendant is innocent or the error had a serious effect on the fairness, integrity, or public reputation of judicial proceedings, independent of the defendant's innocence. *Id.* at 763-764.

The general test for claims of prosecutorial misconduct is "whether a defendant was denied a fair and impartial trial," and the "defendant's opportunity for a fair trial can be jeopardized when the prosecutor interjects issues broader than the defendant's guilt or innocence." *People v Dobek*, 274 Mich App 58, 63-64; 732 NW2d 546 (2007). "Issues of prosecutorial misconduct are decided case by case, and this Court must examine the entire record and evaluate a prosecutor's remarks in context." *Id.* at 64. "A prosecutor may not appeal to the jury to sympathize with the victim." *Unger*, 278 Mich App at 237.

Defendant argues on appeal that the prosecutor improperly appealed to the jury's emotions by presenting unnecessary photographic evidence of the victim with his family. Specifically, certain photographs of the victim with his family, including images of Sicily when she was very young, were shown to the jury during her testimony. Sicily stated that one photograph depicted her and Roberto when she was "a baby." Another photograph showed Sicily with Beverly and Roberto during the last Christmas she remembered spending with him.

Defendant's trial counsel agreed to the admission of certain photographs during the trial. Although there was some initial confusion regarding whether the photographs were admitted by stipulation, this confusion was clearly resolved on the record, and the photographs were indeed admitted by stipulation. Since the evidence was admitted by stipulation, the argument regarding its admissibility has been waived. "Waiver has been defined as the intentional relinquishment or abandonment of a known right." *People v Fackelman*, 489 Mich 515, 543; 802 NW2d 552 (2011), with quotation marks and citations omitted). Defendant intentionally forfeited any argument claiming that these photographs constituted improper appeals to juror sympathy by agreeing to their admission at trial, thus waiving this argument for the purpose of appeal.

Next, defendant contends that the prosecutor engaged in misconduct by appealing improperly to the jury's sympathies during the closing argument by speculating about the victim's final thoughts and emphasizing that the victim had missed 19 Christmases. The comments in question occurred during the prosecutor's closing argument:

> As I lay awake at night I go, what were Robert's last thoughts? Is your last thought seeing a white plastic bag over your eyes, gasping for your last breaths? I hope he was knocked unconscious because that's not what I want my last breaths to be, but if I'm doing justice for Robert, that's something you've got to think about.

> It's only appropriate, ladies and gentlemen, that we are doing this trial near Christmas just as I began in the beginning it's important that we remember it again; Robert has missed 19 Christmases. Robert never got to see his daughter grow up. Robert never got to meet his grandchildren. Not because of some tragic accident or heart attack or something like that. No, cold blooded murder, intentional acts, conspiracies between people; that's why Robert hasn't been able to celebrate the last 19 years of Christmases.

Defense counsel did not object to these comments, but the trial court subsequently instructed the jury during final jury instructions that the jurors "must not let sympathy, bias, or prejudice influence [their] decision."

This Court "cannot find error requiring reversal where a curative instruction could have alleviated any prejudicial effect." *Unger*, 278 Mich App at 235 (quotation marks and citation omitted). "Curative instructions are sufficient to cure the prejudicial effect of most inappropriate prosecutorial statements, and jurors are presumed to follow their instructions." *Id*. (citations omitted). Here, the trial court's instruction cured any potential prejudicial effect of the prosecutor's statements challenged by defendant on appeal. *Id*. Moreover, these statements, although puerile and irrelevant, were relatively brief and occurred within the context of a closing argument that focused primarily on the evidence and the law to advance an argument that defendant was guilty of the charge crimes. Defendant has thus failed to demonstrate plain error affecting substantial rights based on her claims of prosecutorial misconduct. *Carines*, 460 Mich at 763.

Defendant argues in the alternative that her trial counsel was ineffective for failing to object to the alleged instances of prosecutorial misconduct. A claim of ineffective assistance of counsel is preserved by moving to the trial court for a new trial or evidentiary hearing on that basis. *People v Snider*, 239 Mich App 393, 423; 608 NW2d 502 (2000). Here, defendant raised this argument in the trial court through her motion for a new trial or evidentiary hearing, and the trial court denied her motion. This issue is preserved. *Snider*, 239 Mich App at 423. An ineffective assistance of counsel claim presents both questions of fact, which are reviewed for clear error, and questions of constitutional law, which are reviewed de novo. *Unger*, 278 Mich App at 242. If, as in this case, there has not been an evidentiary hearing, this Court's review of an ineffective assistance of counsel claim "is limited to the existing record." *Snider*, 239 Mich App at 423.

An ineffective assistance of counsel claim requires the defendant to "establish (1) the performance of [her] counsel was below an objective standard of reasonableness under prevailing

professional norms and (2) a reasonable probability exists that, in the absence of counsel's unprofessional errors, the outcome of the proceedings would have been different." *People v Sabin (On Second Remand)*, 242 Mich App 656, 659; 620 NW2d 19 (2000). Here, even assuming without deciding that defendant's trial counsel performed deficiently, on appeal she has not made any effort to explain how such brief and relatively trivial evidence and prosecutorial statements could have had any improper prejudicial effect considering the overwhelming evidence of the murder and defendant's role in it. On this record, defendant has failed to demonstrate the requisite prejudice to successfully make an ineffective assistance of counsel claim on this basis. *Id.*

In her appeal, she also contends that this Court should send the matter back for an evidentiary hearing to address her claim of ineffective assistance of counsel. However, she has failed to provide sufficient justification for such a request. Her arguments on appeal rely solely on the existing appellate record, and she has not articulated any specific evidence that she believes could be uncovered during an evidentiary hearing. As a result, defendant has not established a compelling case for why the Court should grant a remand for this purpose. MCR 7.211(C)(1) (stating that a motion filed in the Court of Appeals to remand for an evidentiary hearing "must be supported by affidavit or offer of proof regarding the facts to be established at a hearing.").

## IV. FORENSIC TESTIMONY

Defendant's appellate argument regarding what she characterizes as improper forensic testimony focuses on the trial testimony of Joni Johnson and Amber Smith, both of whom were crime scene investigators in the biology unit of the Michigan State Police Forensic Laboratory. Johnson and Smith processed the basement of the home where Roberto was killed and found blood evidence, some of which was identified as containing Roberto's DNA. As defendant concedes on appeal, she did not object and raise the issues related to the admissibility of this evidence in the trial court. Defendant's evidentiary challenge is therefore unpreserved. MRE 103(a)(1);[7] *People v Jones*, 468 Mich 345, 354-355; 662 NW2d 376 (2003); *People v Stimage*, 202 Mich App 28, 30; 507 NW2d 778 (1993). Although a preserved challenge to a trial court's ruling admitting expert testimony is reviewed for an abuse of discretion, *People v Dobek*, 274 Mich App 58, 93; 732 NW2d 546 (2007), the issue is reviewed for plain error when it is unpreserved. MRE 103(d);[8] *Jones*, 468 Mich at 355.

Smith's role included conducting DNA analysis on the samples after they were returned to the laboratory. She testified that, for the sample collected from beneath the concrete patch, she discovered a mixed DNA profile with multiple contributors. However, the number of contributors was too high for Smith to interpret the data and draw conclusions according to the Michigan State Police policy outlined in their procedure manual. Therefore, she obtained approval to send the data to a private laboratory, Cybergenetics, for analysis using specialized software, which resulted in a

---

[7] This rule has been amended since the trial occurred, but the changes are stylistic and are not at issue in this case.

[8] At the time of trial, this provision appeared in MRE 103(d). It is now contained in MRE 103(e). The stylistic changes are not at issue on appeal.

report. The Cybergenetics report was admitted into evidence by stipulation. Smith testified that the report concluded Roberto was more likely than not a contributor to the DNA profile.

Further, during trial, the prosecutor elicited testimony from both Johnson and Smith regarding their educational and professional backgrounds. Additionally, both witnesses acknowledged that they had previously been admitted as experts and had testified in court on other occasions. However, the prosecutor never formally requested the trial court to admit either witness as an expert. The defense also did not object to the issue of whether either witness had been properly qualified as an expert.

On appeal, defendant contends that Johnson and Smith were impermissibly allowed to testify as experts without having been qualified as experts. A trial court has an obligation, imposed by MRE 702, to serve as a gatekeeper for the admission of expert testimony. *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 779-780; 685 NW2d 391 (2004); *Dobek*, 274 Mich App at 94. "While the exercise of the gatekeeper function is within a court's discretion, the court may neither abandon this obligation nor perform the function inadequately." *Dobek*, 274 Mich App at 94, citing *Gilbert*, 470 Mich at 780.

In her appeal, defendant does not contest the qualifications of either Johnson or Smith as experts in their fields. She also does not assert that they would have been considered non-experts had the prosecutor made a formal request during the trial. The trial court noted during the hearing on defendant's motion for a new trial or evidentiary hearing that it would have recognized these witnesses as experts based on the testimony in the record if the prosecutor had formally requested it. Consequently, defendant has failed to demonstrate any prejudice, even if an error had occurred. *Carines*, 460 Mich at 763. Additionally, a claim of error regarding the trial court's failure to fulfill its gatekeeping function is waived if the party alleging the error did not draw the court's attention to this obligation, which is what defendant's counsel did during trial. *Craig v. Oakwood Hosp*, 471 Mich 67, 82; 684 NW2d 296 (2004).

Defendant additionally contends that it was inappropriate for Smith to interpret the contents of the Cybergenetics report. However, her appellate counsel overlooks critical sections of the trial court record, namely that defendant agreed to the admission of the Cybergenetics report into evidence at trial, making her appellate arguments on this point waived. "Waiver has been defined as the intentional relinquishment or abandonment of a known right." *Fackelman*, 489 Mich at 543. Defendant fails to explain why it was improper for these witnesses to testify about an exhibit that was accepted into evidence with her stipulation. It has long been established that: "[A]n appellant may not merely announce [her] position and leave it to this Court to discover and rationalize the basis for [her] claims, nor may [she] provide only cursory treatment with little or no citation of supporting authority." *People v. Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998).

Defendant also argues that she was denied effective assistance of counsel due to her trial counsel's failure to object to this evidence. She preserved this argument by raising it in the trial court through a motion for a new trial or evidentiary hearing, which the trial court subsequently denied. *Snider*, 239 Mich App at 423. Our review is confined to the existing record since no evidentiary hearing was held on this matter.

As discussed *supra*, defendant has not shown that an objection to the testimony of Johnson or Smith would have led to a ruling against their qualifications as experts or their ability to testify as such. Additionally, she has not provided any evidence or offer of proof demonstrating that the Cybergenetics report was inaccurate or that it would not have been admissible even if her defense counsel had chosen not to stipulate to its admission and had sought to call the report's author as a witness. Defendant has provided no basis on which the trial court or this Court could find that her trial counsel was ineffective for stipulating to the report's admission. *Kelly*, 231 Mich App at 640-641. Consequently, defendant has failed to prove the necessary prejudice for her claim of ineffective assistance of counsel. *Sabin*, 242 Mich App at 659.

Lastly, defendant asserts that this Court should remand the case for an evidentiary hearing regarding her claim of ineffective assistance of counsel. However, her appellate argument relies entirely on the appellate record, and she has not clarified what evidence would be presented during such a hearing. As a result, the defendant has not demonstrated that a remand for an evidentiary hearing should be granted (MCR 7.211(C)(1)), which states that a motion filed in the Court of Appeals to request a remand for an evidentiary hearing "must be supported by affidavit or offer of proof regarding the facts to be established at a hearing."

## V. MANDATORY LIFE WITHOUT PAROLE SENTENCE

Defendant next argues that because she was 21 years old at the time of the offense, her mandatory life-without-parole sentence for first-degree murder constitutes cruel and/or unusual punishment in violation of the federal and state constitutions. Case law dictates a different result.

This Court reviews questions of constitutional law de novo. *People v Parks*, 510 Mich 225, 245; 987 NW2d 161 (2022); *People v Kennedy*, 502 Mich 206, 213; 917 NW2d 355 (2018).

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishment." US Const, Am VIII. The Michigan Constitution prohibits "cruel *or* unusual punishment." Const 1963, art 1, § 16 (emphasis added). Michigan's constitutional provision provides broader protection than its federal counterpart. *Parks*, 510 Mich at 241.

In *Miller v Alabama*, 567 US 460, 465; 132 S Ct 2455; 183 L Ed 2d 407 (2012), the United States Supreme Court held "that mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on cruel and unusual punishments." In *Parks*, our Supreme Court observed that the United States Supreme Court had "drawn a clear and unambiguous line under the United States Constitution between those under the age of 18 and those aged 18 and older" for sentencing purposes, indicating that the Eighth Amendment did not prohibit mandatory life-without-parole sentences for persons who were 18 years of age or older at the time of the offense. *Parks*, 510 Mich at 245-246. Our Supreme Court held in *Parks* that there was no support under the Eighth Amendment and current federal precedent for extending *Miller*'s holding beyond the bright line drawn by the United States Supreme Court at age 17. *Parks*, 510 Mich at 247. However, the Michigan Supreme Court also held in *Parks* that the Michigan Constitution's broader prohibition against cruel *or* unusual punishment precluded mandatory life-without-parole sentences for persons convicted of first-degree murder who were 18 years old at the time of the offense. *Id*. at 268.

Here, defendant argues that this prohibition against mandatory life-without-parole sentences should extend to 21-year-old offenders as well because they share similar characteristics of youth. However, in *People v Adamowicz*, 346 Mich App 213, 219; 12 NW3d 35 (2023), this Court held "that under the Michigan Constitution it was not cruel or unusual punishment to sentence defendant, who indisputably was 21 at the time he committed first-degree premeditated murder, to the mandatory sentence of life without the possibility of parole that the Legislature determined is warranted for this crime." Accordingly, a mandatory life-without-parole sentence for a 21-year-old offender is not prohibited by the United States or Michigan Constitution; the line has been drawn at 17 for purposes of the federal constitution and 18 for purposes of the state constitution. *Miller*, 567 US at 465; *Parks*, 510 Mich at 245-247; *Adamowicz*, 346 Mich App at 219. This Court is bound by decisions of our Supreme Court that have not been clearly overruled or superseded, *Associated Builders & Contractors v City of Lansing*, 499 Mich 177, 191; 880 NW2d 765 (2016), as well as published decisions of this Court, MCR 7.215(C)(2) and (J)(1). Defendant thus has not demonstrated that her sentence is unconstitutional or that she is entitled to resentencing.

Defendant further contends that, given her age of 21 at the time she committed the offense, the imposition of a mandatory life sentence without the possibility of parole for first-degree murder should be deemed cruel and/or unusual punishment. She asserts that such a sentence violates the prohibitions outlined in both the federal and state constitutions. Defendant argues that her youth should be taken into consideration, as it might impact her moral culpability and potential for rehabilitation, making the severity of the punishment disproportionate to her offense. *People v Fletcher*, 260 Mich App 531, 537-538; 679 NW2d 127 (2004); *People v Benberry*, 24 Mich App 188, 191-192; 180 NW2d 391 (1970). See also, *People v Abraham*, ___Mich App ___; ___NW3d ____ (2025), explicitly rejecting Abraham's arguments that the equal protection clause and the prohibition against cruel and/or unusual punishments precludes LWOP sentences for defendants between the ages of 19 to 25.

## VI.  ALLEGED JUROR MISCONDUCT

Next, defendant alleges that the jury foreperson committed misconduct by considering extrinsic evidence during the trial. She preserved this issue for appeal by raising it in her posttrial motion for a new trial or evidentiary hearing, which was denied by the trial court. *People v Fletcher*, 260 Mich App 531, 537-538; 679 NW2d 127 (2004); *People v Benberry*, 24 Mich App 188, 191-192; 180 NW2d 391 (1970).

This Court reviews for an abuse of discretion a trial court's ruling on a motion for a new trial based on alleged improper conduct by a juror. *People v Johnson*, 245 Mich App 243, 250; 631 NW2d 1 (2001). "This Court also reviews for an abuse of discretion a trial court's decision concerning whether to hold an evidentiary hearing." *People v Rose*, 289 Mich App 499, 528; 808 NW2d 301 (2010). " 'An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes.' " *Guajardo*, 300 Mich App at 34, quoting *Unger*, 278 Mich App at 217. Questions of constitutional law are reviewed de novo. *Unger*, 278 Mich App at 242.

Our Supreme Court has set forth the following legal framework applicable to a claim that a juror was improperly exposed to and considered extrinsic evidence:

A defendant tried by jury has a right to a fair and impartial jury. During their deliberations, jurors may only consider the evidence that is presented to them in open court. Where the jury considers extraneous facts not introduced in evidence, this deprives a defendant of his rights of confrontation, cross-examination, and assistance of counsel embodied in the Sixth Amendment.

In order to establish that the extrinsic influence was error requiring reversal, the defendant must initially prove two points. First, the defendant must prove that the jury was exposed to extraneous influences. Second, the defendant must establish that these extraneous influences created a real and substantial possibility that they could have affected the jury's verdict. Generally, in proving this second point, the defendant will demonstrate that the extraneous influence is substantially related to a material aspect of the case and that there is a direct connection between the extrinsic material and the adverse verdict. If the defendant establishes this initial burden, the burden shifts to the people to demonstrate that the error was harmless beyond a reasonable doubt. We examine the error to determine if it is harmless beyond a reasonable doubt because the error is constitutional in nature. The people may do so by proving that either the extraneous influence was duplicative of evidence produced at trial or the evidence of guilt was overwhelming. [*People v Budzyn*, 456 Mich 77, 88-90; 566 NW2d 229 (1997) (citations omitted).]

Furthermore, "[t]he inquiry whether the extrinsic influences could have affected the jury's verdict is an objective inquiry." *Id*. at 89 n 10. The following factors may be considered in determining whether a real and substantial possibility of prejudice was created by the extrinsic influence:

(1) whether the material was actually received, and if so how; (2) the length of time it was available to the jury; (3) the extent to which the juror discussed and considered it; (4) whether the material was introduced before a verdict was reached, and if so at what point in the deliberations; and (5) any other matters which may bear on the issue of the reasonable possibility of whether the extrinsic material affected the verdict. [*Id*. at 89 n 11 (quotation marks and citation omitted).]

Defendant's argument centers around a media interview given by juror #13, the jury foreperson. In the interview, he stated that he believed it was important to stay updated on local news. He had set his Google feed to provide local news updates, followed multiple news outlets, and intended to keep "an ear to the ground" to track future developments. Defendant claims that this indicates the juror was necessarily exposed to prejudicial, extraneous information not admitted into evidence during the trial. A video recording of the interview was submitted to this Court, surprisingly by the prosecution rather than the defendant. The interview features two jurors, including the foreperson mentioned by the defendant in the appeal.

Defendant does not specify when the interview took place, although the prosecution asserts in its brief that it occurred after the trial. It is evident from the beginning of the video, where both jurors discuss their experiences serving on the jury, that it was recorded after the trial and after the verdict was rendered.

-17-

To support her appellate claim, defendant references approximately 30 seconds of the interview, specifically from 46:14 to 46:45. However, she fails to consider the context of the juror's response. Upon reviewing the video, the interviewer asked the jurors whether they would be interested in following the events of "Beverly's trial" once it occurred. Juror #13 responded second, after the other juror answered first. He expressed uncertainty about whether he would actively "follow" it but mentioned that he would "keep an eye out." He then made the comments that the defendant now contests, stating it was important for him to stay updated on local news and that he would have "an ear to the ground" to track it.

Defendant claims in her appellate brief that "[t]he news provided by the juror's Google news feed exposed him to extraneous information that was otherwise inadmissible, and defendant had no way of confronting, explaining, or challenging this information." However, this assertion is based on speculation. The comments cited from the media interview relate solely to future events regarding Beverly's trial, which was the subject of the juror's response. Defendant does not provide any evidence that the juror was following news stories about her trial during the proceedings or that he disregarded the trial judge's explicit instructions against such actions. The trial court repeatedly instructed the jury throughout the trial not to look at news reports regarding the trial and to disregard any reports they might inadvertently encounter. For instance, at the end of the first day of testimony, the trial judge admonished the jury before they recessed: "Please remember that the only information you can consider in this case is that which you receive in this courtroom when the Prosecutor, the defense, and I are present. You cannot research anything. You cannot read any newspapers. You cannot go on social media. You cannot perform any experiments. If this case is picked up by the press and you see something on the news or on any electronic devices you may have, or on social media, stop watching it immediately." "[J]urors are presumed to follow their instructions." *Unger*, 278 Mich App at 235. Because defendant has not presented any evidence that a juror was exposed to improper extrinsic information about her trial during the trial, the trial court did not abuse its discretion by denying defendant's motion for a new trial. *Budzyn*, 456 Mich at 88-89.

Furthermore, defendant has not provided any offer of proof to show that such evidence would be elicited if she were granted an evidentiary hearing. Mere speculation about the type of evidence that a defendant *hopes* to uncover is an insufficient basis on which to grant an evidentiary hearing. *Rose*, 289 Mich App at 531. She therefore has not shown that the trial court abused its discretion by denying her request for an evidentiary hearing. *Id*. Defendant also has not shown that she is entitled to an order from this Court remanding the matter for an evidentiary hearing. MCR 7.211(C)(1) (stating that a motion filed in the Court of Appeals to remand for an evidentiary hearing "must be supported by affidavit or offer of proof regarding the facts to be established at a hearing."). Defendant's appellate argument is premised a mischaracterization of the factual record and is without merit.

## VII. JURY INSTRUCTIONS

Next, defendant argues that the jury instructions regarding open murder and the trial court's answer to the jury's question seeking clarification on the matter were "confusing." Defendant contends that the instructions did not make it clear that for Count 1, the jury had the option to find defendant not guilty of murder, or guilty of first-degree murder, or guilty of second-degree murder.

Defendant also maintains that the instructions foreclosed a finding of guilt on the lesser crime of second-degree murder.

The trial court instructed the jury in relevant part as follows:

The defendant is charged with counts that is with crimes of homicide, open murder, conspiracy to commit homicide, murder first degree, premeditated, and dead bodies, disinterment and mutilation. These are separate crimes, and the prosecutor is charging that the defendant committed all of them. You must consider each crime separately in light of all the evidence. You may find the defendant guilty of all, or any combination of these crimes; guilty of a lesser crime; or not guilty.

First degree premeditated murder. *In count one, the defendant is charged with the crime of homicide, open murder. To prove this charge the prosecutor must prove the defendant is guilty of either first degree premeditated murder or second degree murder.* To prove the charge of *first degree premeditated murder* the prosecutor must prove each of the following elements beyond a reasonable doubt.

First, that the defendant caused the death of Roberto Caraballo. Second the ,defendant intended to kill Roberto Caraballo. Third, that this intent to kill was premeditated, that is, thought out beforehand. Fourth, that the killing was deliberate, which means the defendant considered the pros and cons of the killing, and thought about, and chose her actions before she did it. There must have been real and substantial reflection for long enough to give a reasonable person a chance to think twice about the intent to kill. The law does not say how much time is needed. It is for you to decide if enough time passed under the circumstances of this case. The killing cannot be the result of a sudden impulse without thought or reflection.

*In count two*, the defendant is charged with the crime of *homicide, open murder. To prove this charge the prosecutor must prove the defendant is guilty of either first degree premeditated murder or second degree murder.* To prove the crime of *second degree murder* the prosecutor must prove each of the following elements beyond a reasonable doubt. First, that the defendant caused the death of Roberto Caraballo. Second, that the defendant had one of these three states of mind: she intended to kill; or she intended to do great bodily harm to Roberto Caraballo; or she knowingly created a very high risk of death or great bodily harm knowing that death or such harm would be the likely result of her actions.

You'll see in the jury instructions that I am giving you juror instruction 16.6, which is an element chart of first degree premeditated murder and second degree murder. On the left hand side it goes down the elements of first degree premeditated murder that I have just read to you, and on the second side it goes through second degree murder with each of the elements I have just read to you. Again, you are gonna have a -- each of you have your own written copy of these instructions and the chart is at 16.6.

You must think about all the evidence in deciding what the defendant's state of mind was at the time of the alleged killing. The defendant's state of mind may be inferred from the kind of weapon used, the type of wounds inflicted, the acts and words of the defendant, and any other circumstances surrounding the alleged killing. You may have infer [sic] that the defendant intended to kill if she used a dangerous weapon in a way that was likely to cause death. Likewise, you may infer that the defendant intended the usual results that follow from the use of a dangerous weapon. A dangerous weapon is any instrument that, if used in a way that is likely to cause serious physical injury or death. Premeditation and deliberation may be inferred from any actions of the defendant which show planning or from any other circumstances surrounding the killing. The prosecutor need not prove a motive for the killing, but you may consider evidence of motive in deciding if there was premeditation and deliberation. Motive by itself does not prove premeditation or deliberation.

In this case, the *defendant is charged with homicide open murder, which involves either first degree premeditated murder, or second degree murder, or intentionally assisting someone else in committing it*. Anyone who intentionally assists someone else in committing a crime is as guilty as the person who directly commits it, and can be convicted of that crime as an aider and abettor.

To prove this charge, the prosecutor must prove each of the following elements beyond a reasonable doubt. First, that the alleged crime was actually committed either by the defendant or someone else. It does not matter whether anyone else has been convicted of the crime. Second, that before or during the crime the defendant did something to assist in the commission of the crime. Third, at the time the defendant must have intended the commission of the crime alleged, or must have known that the other person intended its commission, or that the crime alleged was a natural and probable consequence of the commission of the crime intended. It does not matter how much advice, help, or encouragement the defendant gave. However, you must decide whether the defendant intended to help another commit the crime, and whether her help, advice, or encouragement actually did help advise or encourage the crime. Even if the defendant knew that the alleged crime was planned or was being committed, the mere fact that she was present when it was committed is not enough to prove that she assisted in committing it.

*In count two the defendant is charged with the crime of conspiracy to commit homicide, murder first degree, premeditated*. Anyone who knowingly agrees with someone else to commit first degree premeditated murder is guilty of conspiracy. [Emphasis added.]

The trial court's jury instructions included the following:

Now we have prepared, there is a jury verdict form, ladies and gentlemen. This is it. This will be in the jury room with you. It says you may return only one verdict per column, and then it's highlighted and underlined, mark only one box for each column. Count one, homicide open murder, not guilty, guilty of first degree

-20-

premeditated murder, or guilty of second degree murder; check one for count one. Count two, murder first degree premeditated, not guilty, guilty of conspiracy to commit first degree murder. Second page, count three dead bodies, disinterment, mutilation, first box, not guilty; second box, guilty of dead bodies, disinterment. The foreperson will then date it and sign it and this is what -- how the verdict will be, um, communicated in the courtroom when you come back in with your verdict.

The verdict form is in the lower court file. It contains three counts. Count 1 is labeled, "HOMICIDE – OPEN MURDER." Count 2 is labeled, "CONSPIRACY TO COMMIT HOMICIDE – MURDER FIRST DEGREE – PREMEDITATED." Count 3 is labeled, "DEAD BODIES – DISINTERMENT & MUTILATION." For the open murder count, the jury had the option of selecting "Not Guilty," "Guilty of First-degree Premeditated Murder," or "Guilty of Second-degree Murder."

After the trial court finished reading the instructions and the jury left the courtroom to begin deliberations, the court asked the parties if there were "any objections to the instructions?" Defendant's trial counsel stated, "No, your Honor."

Subsequently, the jury sent a note asking a question. The trial court read the note on the record to the attorneys, and a discussion ensued to craft a response. The court stated:

It says, question from jury, we need a little -we need a little guidance on all of the charges. Clarification combining charge one and two, that's what it reads.

After consulting with the attorneys for both sides, the trial court wrote a response instructing the jury to "look at each count independently" and to "pick one" of the three choices for Count 1, which were as follows: "One, not guilty; two, guilty first degree premeditated murder, see 16.1; or three, guilty second degree murder, see 16.5." The trial court then stated, "Show it to each of [the attorneys], and if they're okay with it, they initial it, we send it back."

Defendant argues on appeal that the jury instructions regarding open murder and the trial court's answer to the jury's question seeking clarification on the matter were "confusing." As an initial matter, this argument is waived because defendant's trial counsel clearly expressed satisfaction with the jury instructions by affirmatively indicating that he had no objections and to the trial court's response to the jury's question by approving the response through initialing it. *People v Kowalski*, 489 Mich 488, 503; 803 NW2d 200 (2011) ("When defense counsel clearly expresses satisfaction with a trial court's decision, counsel's action will be deemed to constitute a waiver."). Waiver is the "intentional relinquishment or abandonment of a known right," and a waiver extinguishes any claim of error. *Id*. (quotation marks and citation omitted).

However, even if the issue is not treated as waived, there is no question that trial counsel did not object or propose an alternate instruction and the argument must be reviewed only for plain error affecting substantial rights. *Sabin*, 242 Mich App at 657; *Carines*, 460 Mich at 761, 764.

A criminal defendant has a constitutional right to have a jury determine his or her guilt from its consideration of every essential element of the charged offense. A defendant is thus " 'entitled to have all the elements of the crime submitted to the jury in a charge which [is] neither erroneous nor misleading . . . .' " Instructional

errors that omit an element of an offense, or otherwise misinform the jury of an offense's elements, do "not *necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." Accordingly, an imperfect instruction is not grounds for setting aside a conviction if the instruction fairly presented the issues to be tried and adequately protected the defendant's rights. [*Kowalski*, 489 Mich at 501-502 (citations omitted; alteration and ellipsis in original).]

Under MCL 750.318, "[t]he jury before whom any person indicted for murder shall be tried shall, if they find such person guilty thereof, ascertain in their verdict, whether it be murder of the first or second degree . . . ." Consistent with this statute, defendant maintains that it should have been made clear to the jury that on Count 1, the jury could find defendant either not guilty, guilty of first-degree murder, or guilty of second-degree murder. However, considering the trial court's instructions to the jury as a whole, *Kowalski*, 489 Mich at 501, it is clearly evident that the trial court's instructions were consistent with both the statute and defendant's appellate counsel's assertions of how the jury should have been instructed. The trial court stated at least three separate times that for Count 1, defendant was charged with open murder and that the jury could find defendant guilty of either first-degree murder or guilty of second-degree murder. The jury was further instructed that it could also find defendant not guilty on that count. The trial court's clarification in response to the jury's question reiterated these points.

That the judge misspoke by referring to the second-degree murder portion of the open murder instructions as "Count 2," when considered within the context of the instructions as a whole does not somehow make the instructions inherently misleading. *Id*. Moreover, the jury's question and the trial court's response clarified any potential confusion. It is difficult to understand how these instructions, considered as a whole, could be construed as anything but a fair presentation of the issues to be tried that adequately protected defendant's rights. *Id*. at 501-502. Thus, defendant has failed to establish plain error or that there was any prejudice. *Carines*, 460 Mich at 763.

Defendant further contends that her trial counsel was ineffective for failing to protect her right to a properly instructed jury. Defendant also raised this argument in the trial court through her motion for a new trial or evidentiary hearing, and the trial court denied her motion. Defendant thus preserved this issue. *Snider*, 239 Mich App at 423. However, there was no evidentiary hearing, so our review "is limited to the existing record." *Snider*, 239 Mich App at 423. As we have already concluded, the jury instructions fairly presented the issues and adequately protected defendant's rights. She therefore has not demonstrated that her trial counsel performed below an objective standard of reasonableness or that she was prejudiced. *Sabin*, 242 Mich App at 659.

Defendant also asserts that this Court should remand the matter for an evidentiary hearing regarding her ineffective assistance of counsel claims. However, her appellate argument is entirely based on the appellate record and she has not explained what evidence she would elicit through such a hearing. Consequently, she has not demonstrated that remand for an evidentiary hearing should be granted. MCR 7.211(C)(1) (stating that a motion filed in the Court of Appeals to remand for an evidentiary hearing "must be supported by affidavit or offer of proof regarding the facts to be established at a hearing.").

## VIII. CUMULATIVE ERROR

Defendant argues that reversal is required based on cumulative error. "This Court review[s] a cumulative-error argument to determine if the combination of alleged errors denied the defendant a fair trial." *People v Hill*, 257 Mich App 126, 152; 667 NW2d 78 (2003). Only *actual* errors may be considered when evaluating whether reversal is warranted due to cumulative error. *People v LeBlanc*, 465 Mich 575, 591 n 12; 640 NW2d 246 (2002).

"[T]he cumulative effect of several minor errors may warrant reversal where the individual errors would not." *Unger*, 278 Mich App at 261. "Only the unfair prejudice of several *actual* errors can be aggregated to satisfy the standards set forth in *People v Carines*, 460 Mich. 750, 774; 597 NW2d 130 (1999)." *LeBlanc*, 465 Mich at 591 n 12. Here, as discussed previously, defendant has not shown that any errors occurred or that there was any prejudice even assuming any of her complaints amounted to error. As our Supreme Court has stated, "It is true that the cumulative effect of several errors can constitute sufficient prejudice to warrant reversal where the prejudice of any one error would not." *LeBlanc*, 465 Mich at 591. The lack of prejudice was not even a close question with respect to any of defendant's various alleged errors. Accordingly, she is not entitled to appellate relief based on cumulative error. *Id.*; *LeBlanc*, 465 Mich at 591 n 12.

## IX. CONCLUSION

Defendant has failed to demonstrate any error requiring reversal. We therefore affirm her convictions and sentences.

Affirmed.

/s/ Stephen L. Borrello
/s/ James Robert Redford
/s/ Sima G. Patel